DOWD, J.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| United Steelworkers of America, AFL-CIO, CLC, et al., | ) ) ) | CASE NO. 3:04 CV 7411 |
| Plaintiff(s), | ) ) | |
| v. | ) ) | <u>MEMORANDUM OPINION</u> <u>AND ORDER</u> |
| Cooper Tire & Rubber Company, et al., | ) ) ) | |
| Defendant(s). | ) | |

Before the Court are fully-briefed cross-motions for summary judgment (Doc. Nos. 36, 37) supported by a joint stipulation of facts (Doc. No. 35, corrected by Doc. No. 60). The motions present two questions: (1) whether the plaintiff union has standing to sue on behalf of the class of plaintiffs; and (2) whether this dispute is subject to arbitration. For the reasons discussed below, plaintiffs' motion (Doc. No. 37) is granted and defendants' motion (Doc. No. 36) is denied.

## I.  PROCEDURAL BACKGROUND

On July 15, 2004, plaintiffs United Steelworkers of America, AFL-CIO, CLC ("the USW"),[1] United Steelworkers of America, Local 207L ("Local 207L"), and several individual

---

[1] On April 14, 2005, the USW merged with the Paper, Allied-Industrial, Chemical and Energy Workers International Union to form the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union.

(3:04 CV 7411)

Union members (collectively, "the Union") brought this class action[2] against defendants Cooper Tire & Rubber Company ("Cooper Tire") and the Cooper Tire & Rubber Company Medical/ Prescription Drug Plan and Vision Plan ("the Plan").[3]  The case involves a dispute over the interpretation of a letter agreement between Cooper Tire and Local 207L and the Union's efforts to arbitrate a grievance concerning that dispute.  Count I of plaintiffs' complaint seeks an order under the Labor Management Relations Act of 1947 ("the LMRA"), 29 U.S.C. § 185, compelling Cooper Tire to arbitrate a grievance filed by Local 207L.[4]  The Court agreed that summary judgment motions on this single issue should be filed before any significant discovery or other proceedings would occur.  Those motions are now at issue.

## II.  DISCUSSION

### A.  Factual Background

Cooper Tire manufactures tires and other products used in the automotive industry.  The Union is the exclusive, recognized bargaining representative of the production and maintenance employees of Cooper Tire's Findlay Plant.

The Union and Cooper Tire were parties to a collective bargaining agreement ("the 2000 Basic Labor Agreement") originally effective from November 6, 2000 to October 31, 2003.

---

[2] On December 14, 2004, the case was certified as a class action.  See Doc. No. 21.

[3] The case was transferred to the docket of the undersigned on September 14, 2004.  See Doc. No. 9.

[4] Count II, asserting a breach of contract claim under the LMRA, and Count III, seeking a declaratory judgment under the Employee Retirement Income Security Act of 1974 ("ERISA"), are pled in the alternative to Count I.

2

(3:04 CV 7411)

They were also parties to an Employee Pension and Insurance Agreement ("the 2000 Benefits

Agreement") originally effective for the same time period.[5]

Article 14 of the 2000 Benefits Agreement establishes an "Appeals Procedure."

Specifically, Section 14.1 provides that

> if any dispute . . . shall arise . . . between the Local Union and the Company
> [Cooper Tire] as to the interpretation or application of this Agreement, such
> dispute shall, as the exclusive means of settlement, be taken up as a grievance
> beginning with the step next preceding arbitration [i.e., Step 3 under the Basic
> Labor Agreement], and be thereafter handled in accordance with the Grievance
> Procedure provided for in the Basic Labor Agreement[.]

Doc. No. 60, Exh. B. at 107-08.  Article II(A) of the 2000 Basic Labor Agreement establishes a

Grievance Procedure which culminates in final and binding arbitration.  Therefore, if a dispute

arises under the 2000 Benefits Agreement and is not resolved thereunder, it must ultimately go to

binding arbitration.

Under Section 11.15 of the 2000 Benefits Agreement, Cooper Tire was obligated to

provide various medical benefits to "[e]mployees who retire and who are eligible under the

Employee Benefit Agreement for a Pension (other than a Deferred Vested Pension)" provided

they meet certain eligibility requirements.  (Doc. No. 60, Exh. B. at 87).  Cooper Tire was also

obligated to supply benefits to the dependents and surviving spouse of such retirees.  (Id.).

---

[5]  Copies of the two agreements are attached to Doc. No. 60.

3

(3:04 CV 7411)

By a Letter Agreement dated November 6, 2000 ("the 2000 FASB Letter"),[6] Local 207L and Cooper Tire agreed to caps on the annual company contributions to be paid for benefits "for retirees and their dependents[.]"  (Doc. No. 35, Exh. C).  It provided as follows:

> The average annual Company contributions to be paid for all health care benefits per retired employee (including their surviving spouse) . . . shall not exceed $9,800 for retirees (including surviving spouses) under age 65 and $3,850 for retirees (including surviving spouses) over age 65.  The age of any such, [sic] retiree or surviving spouse will be determined as of each January 1 for the entire year.

(Id.).  The 2000 FASB Letter was one of a series of letter agreements between Cooper Tire and Local 207L (or its predecessor) placing caps on Cooper Tire's costs for retiree health care benefits.

The dispute here is over the interpretation of the quoted language above.  Cooper Tire interprets the dollar figures to be on a family basis; the Union argues that the caps apply on an individual basis.

The specific issue for this Court to decide is whether this dispute over the meaning of this language in the 2000 FASB Letter is subject to binding arbitration.  So far, Cooper Tire has refused to arbitrate, although it did participate in a Step 3 grievance meeting concerning the grievance filed by the Union.

---

[6]  This letter agreement and the caps therein resulted from a new accounting standard (FAS-106) issued by the Financial Accounting Standards Board ("FASB") in 1991 regarding the method by which companies were required to account for liabilities on their balance sheets, in particular, how they were to report post-retirement benefit obligations other than pensions. (Geers Dep., at 13-14) (Doc. No. 43, filed under Seal # 3680).

4

(3:04 CV 7411)

Cooper Tire argues that binding arbitration does not apply because the dispute arises under the separate 2000 FASB Letter, not under either the 2000 Basic Labor Agreement or the 2000 Benefits Agreement which were collectively bargained.  It further asserts that the Union has no standing to pursue any grievance on behalf of retirees, who are no longer employees of Cooper Tire.

The Union argues that it has standing to enforce the agreements with respect to retirees and that Cooper Tire's interpretation ignores the close historical relationship between the collectively bargained agreements and the letter agreement.


**B.  Summary Judgment Standard**

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56 .  When considering a motion for summary judgment, the inferences are viewed in the light most favorable to the party opposing the motion.  U.S. v. Diebold, Inc., 369 U.S. 654, 655 (1962). The adverse party "must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  Further, "'[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'"  Street v. J.C. Bradford & Co., 886 F.2d 1472, 1477 (6th Cir. 1989) (quoting Anderson v. Liberty Lobby, 477 U.S. at 252).

5

(3:04 CV 7411)

In sum, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Anderson v. Liberty Lobby, 477 U.S. at 250.  Put another way, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 251-52.  See also Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 578 (6th Cir. 2003) ("[t]he conflicting proof and the inferences that can be drawn therefrom raise genuine issues of material fact that preclude the grant of summary judgment").


**C.  Discussion**

**1.  The Union's Standing**

Even though the Union no longer serves as the exclusive bargaining representative after an employee's retirement, it may still represent a retiree on a non-exclusive basis in seeking to enforce the retiree's rights under collective bargaining agreements to which the Union and the employer are the only parties.  International Union, United Auto., Aerospace, and Agr. Implement Workers of America (UAW) v. Yard-Man, Inc., 716 F.2d 1476, 1486 (6th Cir. 1983) ("[a]s a signatory to the contract it [the union] could bring an action for the third party beneficiary retirees[ ]" and "the union has a direct interest in maintaining the integrity of the

6

(3:04 CV 7411)

retiree benefits created by the collective bargaining agreement"),[7] cert. denied, 465 U.S. 1007

(1984).

Accordingly, the Court concludes that the plaintiff Union has standing to pursue the

rights of the classes which have been certified herein.[8]

## 2.  Arbitration

Cooper Tire argues that it should not be required to arbitrate a dispute that it never agreed

to submit to arbitration.  However, this argument ignores the history of the 2000 FASB Letter.

In a lengthy exchange at his deposition, James Geers, Cooper Tire's Vice President of

Global Human Resources, testified as follows:

> Q.    And is it not true that Cooper adopted in response to the effectiveness of
>        that rule [FAS-106] what are known as cap letters?
>
> A.    That is correct.
>
> Q.    Were you involved in the process in implementing or adopting those cap
>        letters?
>
> A.    Yes, I was.
>
> Q.    Who else was involved in the company?
>
> A.    Again could you restate the question?  Are you saying adopting or --
>
> Q.    Okay.  I believe you agreed with me with my statement that in response
>        to that rule Cooper Tire adopted what are known as cap letters.
>
> A.    That's correct.

_____

[7] The actual issue presented in Yardman was whether individual retirees could assert
their rights without union involvement.  The court decided that they could, but also noted that it
would be equally appropriate for the Union to pursue the retirees rights.

[8] One class consists of retired employees and their eligible dependents; another class
consists of surviving spouses of retired employees and their eligible dependents.

(3:04 CV 7411)

Q.    What management representatives were involved in the process by which those were adopted?

A.    As far as the letters go, I would have been responsible for the letters.

* * *

Q.    Who made the actual decision to adopt the cap letters?

A.    The ultimate decision?

Q.    Yes.

A.    Would have been our corporate staff.

Q.    And what do you mean by corporate staff?

A.    At that time, it's a little different today, but at that time there was a corporate group of people that met on a regular basis at the highest level of the company, officers of the company that met and discussed a lot of things, but they ultimately and would have made the decision that yes, we are going to invoke caps.

Q.    Were you involved in that process?

A.    In the decision process?

Q.    Yes.

A.    No, I was not.

Q.    Did you make recommendations to that group?

A.    Myself as well as others, yes.

* * *

Q.    When did this corporate group adopt the FASB cap letter?

A.    To say that they ever adopted the letter is a mistake.  They adopted the principal [sic] of putting the caps in sometime 1991, that we would be no different than a lot of industries and definitely no different than our counterparts at the other rubber companies.

* * *

8

(3:04 CV 7411)

Q.   Okay, thank you.

     Mr. Geers, in the stack of documents in front of you, there should be
     defendants' exhibit number one.

     * * *
     Do you recognize this document?

A.   I do.

Q.   Is it the cap letter that was negotiated between Local 207 of the Rubber
     Workers and Cooper Tire and Rubber Company and dated November 24,
     1991?

A.   It's a letter that came out in 1991 negotiations relative to the caps on
     retiree health care.

Q.   Was this letter negotiated between Local 207 and Cooper Tire and
     Rubber Company?

A.   This is not an agreement, it's a letter from the company explaining how
     we were going to deal with retiree health care going forward, similar to
     what happened with the rest of the rubber companies.

Q.   You say this is not an agreement?

A.   That's correct.

Q.   Can you look on the second page of the document?

     * * *
     Do you see that last line?

     * * *
     What does it say?

A.   Says agreed, President Local 207, URCLPWA and signed by Fred Cook.

Q.   And if this is not an agreement, why is that line and Mr. Cook's
     signature there?

     * * *

     . . .  Can you focus your answer on if this is not an agreement why does
     the last line say agreed and have Mr. Cook's signature?

9

(3:04 CV 7411)

A.      . . .  It was asked for the locals including this Local and others to say is that okay with you guys and they said yes, this is okay.

         But to my knowledge, and I know it wasn't in Findlay, we never negotiated the amounts, we never negotiated how it was going to be done, ever.

         The letter was prepared and this was patterned after Goodyear's, and it was said this is how we are going to deal with this cap.

Q.      But you asked the Local Union if this was okay?

A.      To do it this way.

Q.      And the Local Union said yes?

A.      That's correct.

Q.      And wouldn't that assent and saying okay, this is fine with us, be an agreement?

A.      They had no objection, so us deciding to do it this way, that's correct.

Q.      But not only did they have no objection, Mr. Cook signed it saying agreed?

A.      Absolutely.

Q.      Did you ever tell Mr. Cook that he really wasn't agreeing to anything?

A.      Never did.

Q.      And I apologize if I have asked this before, this letter was discussed with representatives of Local 207 as a part of the 1991 negotiations?

A.      Yes, it would have been.

(Geers Dep. at 14-23) (Doc. No. 43, filed under Seal # 3680).  Apparently, this same process of "approval" took place every time there were new labor/benefits agreements and new letter agreements.  Questioned specifically about the negotiations that took place in 2000, J. Michael Delaney, a Human Resource Manager for Cooper Tire, testified as follows:

10

(3:04 CV 7411)

Q.   I believe you testified there was one session [during negotiations] at which the FASB letters were discussed?

A.   Yes.

        * * *

Q.   Do you remember who was at that session?

A.   Bargaining committee and company bargaining team.

        * * *

Q.   Do you remember any questions from any of the Union representatives?

A.   There was some discussion.  I don't remember anything in particular.

Q.   Do you remember any union representative expressing an objection to what Mr. Geers was proposing to do?

A.   No, I don't.

Q.   Did Mr. Geers respond at all to the Union's request in its proposal, which is defendants' Exhibit Number 15, to raise the FASB caps?

A.   No.  We would have said no.

        * * *

Q.   But did any Union representative say anything about that or object to that?

A.   I don't recall anything exact but I know they wanted the cap raised, period, and we said no on that.

        What we did say was that we wanted to make the number right on the letter.

Q.   So you now remember telling the Union no, that we would not increase the cap?

A.   We have always said no.

        * * *

Q.   Can you pull out defendants' Exhibit Number 20, sir?

11

(3:04 CV 7411)

* * *

Do you recognize this document, Mr. Delaney?

* * *

A.    It's the document we refer to as a FASB letter.

Q.    For 2000?

A.    That's correct.

Q.    And this was the product of the negotiations at the bargaining table in 2000?

      Ms. Noall:     Objection.

A.    This was part of the packet that we came up with in 2000.

Q.    And this was the end result of the discussions at the bargaining table that you spoke about a minute ago?

A.    Yes.  This was not negotiated, it was a part of the package.

* * *

Q.    You discussed this at the bargaining table?

A.    Yes.

Q.    And on the second page, last line, it has agreed, colon, and somebody's signature?

A.    Yes.

(Delaney Dep. at 35-43) (Doc. No. 42, filed under Seal # 3680).

    Frank Cline, the Chairman of the Union's negotiating committee also testified as follows with respect to the 2000 FASB letter:

Q.    Now, in point of fact, you [the Union] had made a kind of general proposal to raise the FASB caps, right?

A.    Correct.

* * *

12

(3:04 CV 7411)

Q.     Prior to meeting with the company negotiators, do you recall the union negotiators having an earlier meeting with Ms. Stump in which you discussed what kind of proposals you should make regarding changes to benefits and changes to FASB caps, do you recall having a pre-negotiating meeting with Ms. Stump?

A.     Yes.

* * *

Q.     Had you already looked at the FASB letters by the time you had this meeting with Ms. Stump?

A.     Yes.

(Cline Dep. at 41, 49).[9]

In Steelworkers v. Mead Corp., Fine Paper Div., 21 F.3d 128 (6th Cir. 1994), the court

outlined the principles which guide this Court's analysis of the arbitrability of this dispute:

The guiding principles for determining whether a grievance is arbitrable are well established: (1) a party cannot be forced to arbitrate any dispute that it has not obligated itself by contract to submit to arbitration; (2) unless the parties clearly and unmistakably provide otherwise, whether a collective bargaining agreement creates a duty for the parties to arbitrate a particular grievance is an issue for judicial determination; (3) in making this determination, a court is not to consider the merits of the underlying claim; and (4) where the agreement contains an arbitration clause, the court should apply a presumption of arbitrability, resolve any doubts in favor of arbitration, and should not deny an order to arbitrate "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."  See AT & T Technologies, Inc. v. Communications Workers, 475 U.S. 643, 648-51, 106 S.Ct. 1415, 1418-19, 89 L.Ed.2d 648 (1986) (quoting Warrior & Gulf Navigation, 363 U.S. at 582-83, 80 S.Ct. at 1353).  Moreover, in cases involving broad arbitration clauses the Court has found the presumption of arbitrability "particularly applicable," and only an express provision excluding a particular grievance from arbitration or "the most forceful evidence of a purpose to exclude the claim from arbitration can prevail."  Id. 475 U.S. at 650, 106 S.Ct. at 1419 (quoting Warrior

_____

[9] The "Ms. Stump" referred to in the testimony was identified as "a pension and insurance individual."  (Cline Dep. at 43).

13

(3:04 CV 7411)

> & Gulf Navigation, 363 U.S. at 584-85, 80 S.Ct. at 1353-54); see also
> International Union, UAW v. United Screw & Bolt Corp., 941 F.2d 466, 472-73
> (6th Cir.1991) (finding that the employer had "not satisfied the requirement for
> forceful evidence to overcome the presumption that the grievances should be
> arbitrated").

21 F.3d at 131.

The dispute presently before this Court clearly falls within the language of Article 14 of the 2000 Benefits Agreement, which calls for arbitration of "any dispute . . . as to the interpretation or application of this Agreement[.]"  This very broad language requires a presumption of arbitrability that can be overcome by only the "most forceful evidence."  No such evidence is in this record.  Furthermore, the 2000 FASB Letter explicitly references the 2000 Benefits Agreement, thereby requiring that the Letter be interpreted in light of and consistent with the Benefits Agreement.

Clearly, the 2000 FASB Letter, which ends with an "Agreed" line for the Union's president to sign, was perceived as being part of the collective bargaining process, whether or not the caps set by the letter were themselves an issue on which Cooper Tire would have budged during negotiations.  It is disingenuous for Cooper Tire to take the position that the contents of this letter had no bearing on the collective bargaining.

In this Court's view, the various FASB Letters were inextricably intertwined with the various Basic Labor Agreements and the various Benefits Agreements in the bargaining history between the Union and Cooper Tire.  Therefore, this Court concludes that the presumption of arbitrability is strong and has not been overcome.

14

(3:04 CV 7411)

### III.  CONCLUSION

For the reasons set forth above, the Court concludes that the dispute at issue is a matter for arbitration under the collectively bargained agreements between the parties.  Therefore, plaintiffs' motion for summary judgment (Doc. No. 37) is granted; defendants' motion (Doc. No. 36) is denied.

By separate order, the Court will dismiss this action with directions that the matter shall be arbitrated under the terms of the collectively bargained agreements.

IT IS SO ORDERED.


  October 17, 2005                               *s/ David D. Dowd, Jr.*
Date                                          David D. Dowd, Jr.
                                              U.S. District Judge